U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 JUN 10 PM 4:44

BY \_\_\_CLERK\_\_\_
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:12-cr-115 |
| ) | |
| GEORGE ALLEN ) | |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**
(Doc. 15)

This matter came before the court on March 28, 2013 for oral argument on Defendant George Allen's motion to suppress evidence. (Doc. 15.) Defendant supplemented his motion on April 29, 2013 with a forensic examination but neither party requested a supplemental evidentiary hearing or further oral argument. The court took the matter under advisement on May 14, 2013 when the parties advised the court that no further hearing was requested.

Defendant is charged in a one-count indictment with conspiring to set fire to underbrush and grass on the public domain, in violation of 18 U.S.C. § 1855. He seeks suppression of statements he made to Vermont State Police ("VSP") Arson Unit detectives on May 20, 2008, arguing that those statements were not voluntarily made. The Government opposes the motion.

The Government is represented by Assistant United States Attorney William B. Darrow. Defendant is represented by Mark E. Furlan, Esq.

I. **Findings of Fact.**

  A. **Defendant's May 20, 2008 Police Interview.**

In May of 2008, VSP detectives and the United States Forest Service jointly commenced an investigation into a series of fires in and around the Green Mountain National Forest. On May 20, 2008, VSP Detective Sergeants James Cruise and Tom Williams travelled to the Wallingford, Vermont Volunteer Fire Department ("WFD") to

speak with WFD Chief Warren Allen about the fires. The VSP detectives asked Chief Allen if he had some knowledge about what was going on and why the detectives were there. Chief Allen answered in the affirmative and the conversation turned to the detectives' suspicion that some WFD firefighters were involved in setting the fires. Chief Allen agreed that this was possible and identified two WFD firefighters by name. The detectives then reviewed a "run sheet" of all of the fires to which the WFD had responded that spring and a list of active WFD firefighters. When Chief Allen was asked whether there were any firefighters that were closer to him that might be involved, he pointed to the names of his two sons on the list and said that he was fearful that they might be involved in the fires as well. The detectives asked Chief Allen whether he would allow them to interview some of the WFD firefighters at the WFD station that day.[1] Chief Allen agreed to this request and offered to call his son, Defendant George Allen, to arrange an interview that day. On that same day, Chief Allen arranged an interview with his other son who was also a WFD firefighter.

In response to his father's telephone call, Defendant travelled to the WFD station to meet with VSP detectives. After Defendant arrived at the WFD station, the detectives asked whether he would be willing to speak with them. Defendant agreed and suggested the interview take place in a large multi-purpose room on the second floor of the WFD station. The detectives and Defendant went upstairs to the room and sat around a table with Defendant at one end of the room.

At the time of the interview, Defendant was approximately twenty-five years old. He had graduated from high school and had obtained additional technical education in auto body repair and refinishing. Defendant's work experience included employment as a mechanic and a certified tractor/trailer tire specialist. Defendant had been involved in firefighting from the age of thirteen to twenty-four and was a captain of the WFD. Defendant had never been arrested or incarcerated. Detective Cruise credibly testified that he did not discern any "issues" with Defendant or any problem with Defendant's

---

[1] The VSP detectives interviewed Chief Allen and three WFD firefighters on the day in question.

understanding of what was being asked of him. He described Defendant as "appropriate," "polite," and noted that he "[c]onversed well." (Doc. 25 at 9.)

Defendant was alone with the two detectives throughout the approximately forty-four minute interview. The VSP detectives wore plain clothes, were unarmed, and did not use, display or threaten to use physical restraints. They also made no other show or threat of force against Defendant. The detectives did not raise their voices during the interview and the tone of the interview remained "low-key" and conversational throughout. *Id.* at 9. There is no evidence that either of the detectives physically touched Defendant or restricted his freedom of movement in any way.

The VSP detectives did not advise Defendant that he was not under arrest, was free to leave, or that he had a right to remain silent. Instead, they began the interview by telling Defendant that they had already conducted interviews and "gave him several bits of information prior to actually going on tape." *Id.* This conversation last approximately five minutes. During that time, the detectives asked Defendant if he knew why they were interviewing him and who might be involved in the fires to which Defendant responded to both questions in the affirmative. The detectives conveyed to Defendant their belief that the fires were intentionally set. The detectives further advised Defendant that his vehicle had been seen at a fire on federal forest land. They then asked Defendant if he was willing to continue talking to them and whether, instead of taking notes, they could record the interview. Defendant agreed to this approach and the remainder of the interview is captured on a recording which the court has reviewed. (Gov't. Exhibit 1.)

In his motion to suppress, Defendant claims that he asked the VSP detectives whether he needed a lawyer before the recording started and was asked by them in response whether he had done anything wrong to necessitate one. There is no evidence that this exchange occurred. Similarly, there is no evidence to support Defendant's further claim that the detectives told him that it was in his best interests to tell the truth and that they did not believe that anyone was going to go to jail.

In the course of the interview, the VSP detectives repeatedly advised Defendant that they wanted him to be truthful. After Defendant admitted that he and others had been involved directly or indirectly in sixteen fires, the following colloquy ensued:

> **Det. Cruise:** . . . George I'm going to tell you another little thing, okay, people don't forget this because you just came out with a very specific number, and I know it's a tough thing but I'm going to tell you I appreciate how honest you were a few minutes ago. When you came forward and you said yes, I've been involved in these that took a lot of courage okay.
>
> **Defendant:** Well yeah but I can't lie either.
>
> **Det. Cruise:** Okay and that's important for you to be able to continue that theme, you can't lie. One I'm going to tell you why you can't lie, because you suck at it. Okay.
>
> **Defendant:** I know.
>
> **Det. Cruise:** As soon as you lie, it's like a red flag, we both know the minute, the minute you lie okay you do some things, I'm not going to tell what but we instantly know you're not telling the truth. . . .

*Id.* at 3.

Throughout the interview, Defendant repeatedly asserted that he never personally set any of the fires; he did not waiver in that assertion despite the VSP detectives' claims to have evidence to the contrary. He also consistently minimized any involvement of his brother, and he called the WFD firefighters who were actually setting the fires "idiots." (Gov't. Exhibit 2 at 1, 18.) While Defendant denied setting any of the fires, he admitted that he was involved in directing WFD firefighters to set the fires and demonstrated that he understood this statement was incriminating:

> **Det. Cruise:** [O]ther people we've talked to, have said that you had physically set at least one of the fires, possibly two.
>
> . . .
>
> **Defendant:** No, no absolutely not.
>
> . . .

4

> **Det. Cruise**: You just directed [firefighter] Matt to do it and knew Matt was going to do the others?
>
> **Defendant**: Right.

*Id.* at 15.

> **Det. Cruise**: [W]ould it be fair to say that part of what prevented you from calling [the police] is because you knew you were involved in all of these?
>
> **Defendant**: Yeah I guess it would be fair.

*Id.* at 19.

> **Defendant**: . . . I don't know what people are saying about me but I didn't set any fires.
>
> **Det. Cruise**: You just directed Matt to and you knew Matt was involved?
>
> **Defendant**: Right.
>
> **Det. Cruise**: Okay.
>
> **Defendant**: I mean I understand that's as good as setting them but I didn't physically set any of the fires.

*Id.* at 21.

> **Det. Cruise**: You directed Matt to and you knew Matt was going to on approximately 16 of these fires?
>
> **Defendant**: Right.

*Id.* at 22.

Defendant stated that he was not attempting to hurt anyone with his involvement in the fires, and that the primary motivation for the fires was boredom. He acknowledged the safety risks included "[a]nywhere from accidents to heart attacks" and that it was "stupid" to be involved in the fires. *Id.* at 10. Defendant's answers were largely responsive to the questions posed, provided specific details about the fires, and did not reveal any confusion, hesitation, or misunderstandings. There is nothing about Defendant's diction, pace, or vocabulary during the interview that reveals any cognitive

5

deficits, neuropsychological problems, or short-term memory loss. Defendant was not arrested at the conclusion of the interview.

### B. Dr. Eric Drogin's Psychological Assessment of Defendant.

In order to supplement the record on his motion to suppress, Defendant participated in forensic examinations on April 14, 2013 and April 24, 2013 with psychologist Eric Y. Drogin, J.D., Ph.D., ABPP. During the April 14, 2013 examination, Dr. Drogin administered to Defendant an array of tests which included the Beck Anxiety Inventory ("BAI"); Beck Depression Inventory ("BDI-II"); Beck Hopelessness Scale ("BHS"); Cognitive Capacity Screening Examination ("CCS"); Miller Forensic Assessment of Symptoms Test ("M-FAST"); Millon Clinical Multiaxial Inventory ("MCMI-III"); Multimodal Life History Inventory ("MLHI"); Peabody Picture Vocabulary Test ("PPVT4"); Rey's Fifteen Item Test ("Rey's Test"); Shipley Institute of Living Scale ("SILS-2"); and the Trail Making Test ("Trails"). (Doc. 24 at 1.)

Dr. Drogin found that Defendant's score on the CCS indicated that Defendant suffered from "significant short-term memory problems but was deemed sufficient for proceeding with this examination." *Id.* at 2. Dr. Drogin noted that Defendant's score on the Trails test, "utilized to detect current symptoms of organic dysfunction," indicated that Defendant "fell within moderate range of neuropsychological impairment." *Id.* Dr. Drogin concluded, based on Defendant's performance on the SILS-2 test, that Defendant had approximately average word recognition skills but had "a level of abstract reasoning so deficient that it would normally be ascribed either to a child of approximately eight years of age or to a person of [Defendant's] age with Mental Retardation." *Id.* at 2.

Dr. Drogin found that Defendant's score on the Rey's Test "helped to alleviate any concerns that he was attempting to feign a functional disability in this regard," and that Defendant's score on the M-Fast test "did not indicate that he was manufacturing or exaggerating psychiatric symptoms." *Id.* at 2-3. Dr. Drogin's conclusions based on the BDI-II, BHS, and BAI tests were that Defendant was not depressed, and was within the normal range of anxiety and "perspective on future life events." *Id.* at 3. He noted that Defendant's performance on the MCMI-III tests indicated "a significantly compulsive

personality style," but did not indicate "antisocial, psychotic, or substance dependent symptomatology." *Id.*

As Dr. Drogin noted, Defendant denied any history of psychiatric problems, hospitalization, psychotherapy, or counseling. Although Defendant was forced to repeat the second grade, he had never been placed in special education classes. Defendant advised Dr. Drogin that the detectives had not threatened him, and that "everything he had told the police was 'accurate, to the best of my knowledge.'" *Id.* at 4.

During Dr. Drogin's forensic interview of Defendant on April 24, 2013, he read sections of the transcript of Defendant's May 20, 2008 interview with the VSP detectives to Defendant in order to determine whether Defendant understood the nature of the detectives' questions and his responses. With regard to the purpose of the interview, Defendant stated "I assumed they were trying to find out who set these fires" and "they obviously thought I had a part in it." *Id.* at 5. As for the interview itself, Defendant recalled that the detectives accused him of "uh, just knowing . . . I guess knowing about the fires" and that they did not accuse him of actually setting fires. *Id.* When asked whether such knowledge was illegal, Defendant responded "I suppose there is if you don't say anything" but "I guess I didn't know, really . . . that I'd be in trouble if I didn't say anything." *Id.* Defendant asserted that he understood the detectives to have asked him specifically about whether he had knowledge of the fires before they occurred. When Dr. Drogin asked Defendant whether it would be illegal to tell a person where to set a fire, Defendant responded "I wouldn't think so" and stated that when the detectives questioned him he did not anticipate that they would accuse him of a crime. *Id.* at 6.

Dr. Drogin read Defendant other portions of the transcript in which Defendant arguably agreed with statements that the VSP detectives made to him. Defendant confirmed that when he responded "Right" or "Yeah" to the detectives' assertions, he had been agreeing that the assertions were correct. Defendant acknowledged that at certain points, the detectives had been "trying to get me to say I set fires" but that he had not admitted to setting any fires other than a "control burn" intended to contain one of the fires after it was set by another firefighter, and "I didn't think that was wrong." *Id.* at 8.

7

Dr. Drogin also reviewed Detective Cruise's question "would it be fair to say that part of what prevented you from calling us is because you knew you were involved in all of these," and Defendant's response that "Yeah I guess that would be fair." *Id.* at 9. Defendant asserted that his understanding of this exchange was "that I knew that I was involved." *Id.* At the conclusion of the April 24, 2013 forensic interview, Defendant explained to Dr. Drogin that his review of the transcript had not changed his opinion regarding the interview, "other than making me feel[] . . . like I shouldn't have said anything." *Id.* at 10.

Dr. Drogin concluded that Defendant had a "notably uneven and at times clearly inadequate grasp of the nature and implications of his documented interaction with the police in May 2008." *Id.* at 10. He also concluded that "psychological testing identified exceptionally poor abstract reasoning abilities as well as neuropsychological impairment at the screening level. Clinically, these results merit referral to a neurologist for further evaluation." *Id.* Finally, Dr. Drogin concluded that the "forensic interview results raise significant doubts concerning Mr. Allen's ability to process meaningfully and respond validly to the questions with which he was presented at that time." *Id.*

The court accords Dr. Drogin's opinions little weight for several reasons. First, Dr. Drogin's opinion that Defendant has the abstract reasoning ability of either an eight year old or a person who is mentally retarded is simply incredible in light of Defendant's academic and professional career which contains no evidence that would support that conclusion. Similarly incredible is Dr. Drogin's further opinion that Defendant had "significant short-term memory problems" and "fell within moderate range of neuropsychological impairment." *Id.* at 2. Defendant has never previously been diagnosed with short-term memory problems, or a moderate neuropsychological impairment. He has never received special education services, he has no history of psychiatric treatment or hospitalization, and he has not received neuropsychological treatment of any kind. Instead, Defendant graduated from high school with only the second grade repeated, completed vocational and technical training, and maintained employment that was neither nominal or menial in nature. He occupied a supervisory

8

position at the WFD and had the mental capacity to engage in firefighting for over a decade. Dr. Drogin does not even attempt to explain why the level of impairment he ascribes to Defendant could remain undetected until his forensic examination notwithstanding these numerous settings in which such deficiencies would likely be revealed and impair Defendant's progress. The court is thus left with an expert opinion that is markedly inconsistent with Defendant's actual history and no explanation of that discrepancy.

Second, although Dr. Drogin opines that Defendant's interview with the VSP detectives reflects a "notably uneven and at times clearly inadequate grasp of the nature and implications of his documented interaction with the police in May 2008[,]" (Doc. 24 at 10), the interview itself reveals Defendant's accurate and consistent understanding of both the detectives' questions as well as the manner in which his responses could incriminate him. For example, when Defendant was asked about his directing other firefighters to set fires he stated: "I mean I understand that's as good as setting them but I didn't physically set any of the fires." *Id.* at 9. In the face of this accurate statement of co-conspirator liability, Dr. Drogin's conclusion that Defendant was unable to meaningfully process and understand the questions posed to him is unpersuasive.

Finally, neither Defendant nor his counsel have endorsed the level of impairment found by Dr. Drogin. Defendant's counsel describes Defendant as "an unsophisticated fellow" (Doc. 15-1 at 3) while Defendant, himself, has admitted that everything he told the VSP detectives was accurate, thereby disclaiming any misunderstandings or confusion on his part. Indeed, he told Dr. Drogin that he had no problem with the interview "other than making me feel[] . . . like I shouldn't have said anything." Doc. 24 at 10. Accordingly, the court finds no reliable evidence of a cognitive, psychological, or mental impairment that would have rendered Defendant's statements involuntary.

II. **Conclusions of Law and Analysis.**

A. **Whether Defendant's Confession Was Involuntary.**

Defendant agrees that he was not in custody during the May 20, 2008 interview, and thus *Miranda* warnings were not required. He maintains, however, that the

circumstances of the interview, as well as his particular characteristics and lack of experience with law enforcement, rendered his confession involuntary. He points out that the detectives did not advise him that he had the right to remain silent and reminded him that they could detect whether he was lying. He argues they asked him "loaded, sometimes leading questions many of which assumed his . . . guilt," and used "psychologically coercive tactics which both frightened their target and lulled him into a false sense of security." (Doc. 15-1 at 4.)

Under the Fifth Amendment, a defendant's involuntary confession is not admissible at trial. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (quoting *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). "Accordingly, courts place upon the government the burden to prove that a defendant's confession was voluntary." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The Supreme Court has held that "the voluntariness of a statement" depends on whether "the defendant's will was overborne" by police coercion. *Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). Accordingly, coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Fifth Amendment. *Connelly*, 479 U.S. at 164.

"[W]hether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901-02. "The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Id.* at 902. "The second circumstance, the conditions under which a

suspect is questioned, includes the place where an interrogation is held, and the length of detention." *Id.* (internal citations omitted).

> The final . . . circumstance . . . is the law enforcement officers' conduct. Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, whether there was physical mistreatment such as beatings, or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, or even of clothing for a prolonged period. In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Id.* (internal citations omitted). The conduct of law enforcement is particularly important because "a defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164. The *Connelly* Court held that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165.

In this case, Defendant correctly observes that the VSP detectives failed to inform him that he had a right to remain silent and that he was not under arrest and free to leave. However, while the detectives did not instruct Defendant that he possessed those rights, they twice asked Defendant if he was willing to speak to them before beginning the interview thereby making it clear that it was Defendant's option to accept or decline the interview. Defendant arrived at the interview voluntarily and left it without being arrested. *Miranda* warnings are not required in order to find a confession voluntary. *See J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2411 (2011) (*Miranda* requirements "often require courts to suppress 'trustworthy and highly probative' statements that may be perfectly 'voluntary under [a] traditional Fifth Amendment analysis'") (internal citations omitted).

Defendant also points to the VSP detectives' repeated admonitions to tell the truth, coupled with their statements that they would know if he was lying. Courts have noted that "a mere admonition to the accused to tell the truth does not render a confession

involuntary." *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983); *see also Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997); *United States v. Barfield*, 507 F.2d 53, 56 (5th Cir. 1975) ("[A]n officer's admonition to tell the truth . . . does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."). The addition of a statement by a law enforcement officer that he or she will "know" whether a suspect is lying merely underscores the importance of being truthful. It does not increase the likelihood of a false confession. To the contrary, unlike a promise of immunity or a promise that the interview will cease if a confession is obtained, a statement that the interrogator will "know" when he or she hears a false statement is a direct deterrent to a suspect's false confession. There was thus nothing coercive in this case about repeated reminders to Defendant to be truthful coupled with assertions that Defendant "sucked" at lying and the detectives would know if and when this occurred.

Although Defendant accurately characterizes the detectives' questions as leading, there is no prohibition on leading questions and in this case the detectives did not use such questions to badger or trick Defendant into making incriminating statements. Instead, they used leading questions to indicate which fires were under discussion and the information they sought with regard to them. Nothing about the use of this tactic in this case was coercive. *See Wacker v. State*, 1999 WL 138901, at *4 (D. Kan. Jan. 25, 1999) ("[T]he court finds that the use of leading questions was not coercive. The police testified that the leading questions were used during the taped statements in order to control the conversation and keep the suspect on track.").

Finally, Defendant claims that throughout the interview, the detectives asked questions and made assertions which assumed his involvement in the fires including confronting him with information they had gleaned from other interviews. As Defendant admitted his knowledge of the fires at the outset of the interview, he cannot claim to have been tricked, deceived, or surprised by questions during the interview that sought to ascertain the source of his information and the nature and extent of his involvement. In the face of this permissible interrogation tactic, Defendant steadfastly maintained his

innocence in setting the fires even when confronted with allegations that eyewitnesses had seen him do so. His will was thus clearly not overborne.

Counterbalancing Defendant's alleged evidence of police coercion is ample evidence that undercuts any finding of police misconduct. Defendant was not in custody during the interview and was not restrained. He came to the interview at his own volition and had some understanding of the nature of the investigation. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (finding voluntariness in part because meeting was pre-arranged). The VSP detectives wore plain clothes, were unarmed, and did not display or threaten force or restraint. The tone of the interview was conversational and low key and the interview itself was relatively brief. It took place in surroundings that were far more familiar to Defendant than to the detectives and which were not police-dominated. *See United States v. Burns*, 15 F.3d 211, 216 (1st Cir. 1994) (confession voluntary when defendant postal employee interviewed in post office where defendant worked); *United States v. Lamy*, 521 F.3d 1257, 1262 (10th Cir. 2008) (ruling confession voluntary when suspect interviewed in the kitchen of his home because it was a familiar location); *Braxton*, 112 F.3d at 781 (holding confession voluntary when suspect was interviewed in the familiar location of his mother's home). Although Defendant was alone with the detectives, here this period of isolation lasted less than an hour and took place in a familiar setting. *See Green*, 850 F.2d at 903 (finding confession voluntary despite the fact that suspect was apart from family, friends, and counsel during the interview). Defendant was not arrested at the conclusion of the interview nor was he ever threatened with an arrest. The detectives did not use profanity or accuse Defendant of being a liar. They made no promises of immunity or leniency in order to secure his confession.

Based upon the totality of the circumstances, the court finds no evidence of police coercion in this case. On this basis alone, Defendant's motion to suppress must be denied. *See Connelly*, 479 U.S. at 164 (holding "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'").

Defendant's personal characteristics, while relevant, do not support a contrary conclusion. While Defendant points out that he was only twenty-five years old during the interview, even juveniles can give voluntary statements. *Fare v. Michael C.*, 442 U.S. 707, 728 (1979) (statement of sixteen year old was voluntary where police indicated that cooperation would be beneficial but did not threaten or coerce suspect); *United States v. Burrous*, 147 F.3d 111, 116-17 (2d Cir. 1998) (statement of sixteen year old was voluntary where there was no evidence of police coercion); *see also Gilbert v. Merchant*, 488 F.3d 780, 795 (7th Cir. 2007) (statement was voluntary despite the fact that suspect was fourteen). Defendant was an adult with a high school education as well as technical and vocational training. He had apparently been consistently employed and had a position of responsibility at the WFD. There is thus no evidence that his relative youth rendered him unusually vulnerable to police interrogation.

Although Defendant's lack of sophistication and lack of experience with the criminal justice system are relevant factors, they, too, are by no means dispositive. *See Etherly v. Davis*, 619 F.3d 654, 662-63 (7th Cir. 2010) (holding statement voluntary despite fact that suspect was fifteen, was unintelligent, and had no experience with police, because there was no evidence of police coercion); *Connelly*, 479 U.S. at 165 ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."). Similarly, the scant evidence of Defendant's potential cognitive and neuropsychological limitations, while relevant, would not render Defendant's confession involuntary because defendants who have been actually been diagnosed with mental retardation have been held capable of making a voluntary statement. *See United States v. Norrie*, 2013 WL 1285864, at *1 (D. Vt. March 26, 2013); *United States v. Nash*, 414 F. Supp. 1213, 1218 (S.D. Tex. 1976) (finding confession admissible when defendant had subnormal intelligence as demonstrated by his I.Q. of seventy-eight and vocabulary of a fourth grader). In any event, there is no evidence that Defendant's alleged cognitive, short-term memory, and neuropsychological limitations gave rise to an unreliable confession. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349 (2006) ("We require

exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable."). To the contrary, Defendant reaffirmed to Dr. Drogin that he provided only honest and accurate statements to the VSP detectives.

In light of the lack of evidence of police coercion, and the remaining totality of the circumstances, the Government has established that Defendant's statements to VSP police detectives on May 20, 2008 were voluntarily made.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress (Doc. 15).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 10th day of June, 2013.

Christina Reiss, Chief Judge
United States District Court